## RBC NICE BEARINGS, INC., ET AL.
### *v.* SKF USA, INC.
### (AC 32606)

Beach, Sheldon and Bishop, Js.

Argued March 12—officially released October 8, 2013

*Kim E. Rinehart*, with whom were *Joseph W. Martini* and, on the brief, *Matthew C. Brown*, for the appellants-cross appellees (plaintiffs).

*David Richman*, pro hac vice, with whom were *Matthew D. Janssen*, pro hac vice, and *Robert B. Flynn*, and, on the brief, *Steven J. Zakrzewski*, for the appellee-cross appellant (defendant).

*Opinion*

BISHOP, J. The plaintiffs, RBC Nice Bearings, Inc., Roller Bearing Company of America, Inc., and Roller Bearing Company of America, Inc., doing business as Nice Ball Bearings, Inc., appeal from the judgment of the trial court, claiming that the court improperly concluded that (1) through their course of performance[1] the parties had modified their agreement, or, in the alternative, that the parties had signed writings that modified their agreement, and (2) that the plaintiffs had waived their right to claim a breach of the agreement as to the sixth contract year. On cross appeal, the defendant, SKF USA, Inc., claims that the court improperly concluded that it had failed to prove its lost profits damages from the plaintiffs' violation of the exclusivity provision of the contract.[2] We conclude that the court

---

[1] Under the Uniform Commercial Code, as adopted in General Statutes § 42a-1-303 (a), a course of performance "is a sequence of conduct between the parties to a particular transaction that exists if:

"(1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

"(2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection."

[2] The defendant also claims that the court improperly concluded that it failed to prove damages from the plaintiffs' unlawful termination of the contract and improperly denied its restitution/unjust enrichment claim. In light of our decision that the court improperly concluded that the plaintiffs wrongfully terminated the contract, it is unnecessary for us to address these claims, which rely primarily on the ground that the court found that the plaintiffs wrongfully terminated the contract.

incorrectly determined that the parties, through their course of performance, modified their agreement and that the plaintiffs waived their right to claim a breach of contract. We conclude, as well, that the court incorrectly determined that the defendant failed to prove its lost profits claim. Accordingly, we reverse the judgment of the trial court.

The following facts describe the circumstances of the litigation. The defendant owned Nice Ball Bearings, Inc. (Nice), the oldest line of ball bearings manufactured in the United States, until it sold the product line and various assets needed to manufacture Nice products to the plaintiffs on February 28, 1997. The parties simultaneously executed a "Sales and Supply Agreement" (1997 agreement) through which the defendant became the plaintiffs' exclusive distributor for certain Nice products. The 1997 agreement provided for a term of eight years and required that the defendant expend, at a minimum, $9 million for the purchase of Nice products from the plaintiffs each year.

During the 1997–98 and 1998–99 contract years, the defendant's purchases of Nice products did not amount to $9 million. The plaintiffs, however, did not demand compliance with the minimum purchase requirement set forth in the 1997 agreement for those years, nor did they take any steps to challenge the defendant's failure to comply with that requirement. On July 31, 2000, however, the parties negotiated a new sales and supply agreement entitled "Agreement to Amend Sales and Supply Agreement" to reflect changed market realities (2000 agreement). The 2000 agreement superseded the 1997 agreement and stated that the defendant was required to buy not less than $6 million per year of Nice products, while also extending the term of the agreement through 2008. The 2000 agreement also contained an adjustment clause for potential future increases in the minimum purchase requirement to

reflect price increases in the market as well as potential downward adjustments in the minimum purchase requirement based on certain circumstances as outlined in the agreement.[3] The contract year was designated to run from March 1 to February 28 of the following year,[4] with March of each contract year designated as a "catch-up" period, during which the defendant's purchases could be credited toward the prior year, if sales were running behind, or toward the current year if there had not been a shortfall. The 2000 agreement further provided that if, after March, a deficit for the prior year remained, the defendant would be required to pay the plaintiffs the total shortfall by April 30 of the same year, and the plaintiffs also were required to deliver product having a value equal to the amount of the shortfall.

Significantly, the 2000 agreement contained a written modification clause that provided: "No provision of this [agreement] may be waived or amended other than by a written instrument signed by the party against whom enforcement of such amendment or waiver is sought." The agreement further granted the defendant a distributorship under which it would own exclusive rights to sell Nice products to distributor customers in the industrial aftermarket.

During the first year of the 2000 agreement, the defendant purchased the required amount of product from the plaintiffs by purchasing over $6 million of products. Over time, however, the defendant became unable to meet its minimum purchase requirements under the

---

[3] The trial court found that the "downward adjustment" clause only applied to the individual contract year in which it was invoked; it did not permanently reduce the defendant's minimum purchase requirement for any other year.

[4] For the purpose of clarity in this opinion, we refer to the contract years not by the calendar year span (2000–2001) but instead by the annual term of the contract. For example, the first contract year ran from March 1, 2000, through February 28, 2001, and the second contract year ran from March 1, 2001, through February 28, 2002.

2000 agreement and so, in the seventh contract year, the plaintiffs terminated the 2000 agreement by a letter dated June 21, 2006. In the letter, the plaintiffs stated that the reason for termination was "failure to pay the required [fifth] and [sixth] contract year shortfalls." Additional facts will be set forth as necessary.

The following procedural history is relevant to our consideration. On June 22, 2006, the plaintiffs commenced this action against the defendant for failure to meet its contractual obligations under the 2000 agreement in the fifth and sixth contract years and for the anticipatory breach of contract in years seven through nine. By amended complaint, the plaintiffs asserted claims of breach of contract, anticipatory breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, trade secret violation, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., violation of the Connecticut Unfair Sales Practices Act (CUSPA), General Statutes § 42-115e et seq., tortious interference with business relations, and usurpation of corporate opportunity. The defendant filed an amended answer, special defenses and a seven count counterclaim. In its counterclaim, the defendant alleged breach of contract, tortious interference with contractual relations and prospective business relations, unjust enrichment, promissory estoppel, and violations of CUTPA.

After a trial to the court, the court issued a memorandum of decision in which it ruled in favor of the defendant on the plaintiffs' claims and in favor of the plaintiffs on the defendant's counterclaims. The court concluded that the evidence presented clearly demonstrated that the 2000 agreement had been modified by the conduct of the parties, "who for most of the contract period did not follow the annual sales requirements set forth therein, and instead negotiated mutually acceptable,

annual purchase volumes based on the realities of the market and on their business capacities." The court also found evidence of written modifications for "each of the contract years in dispute." The court found that for the fourth and fifth contract years, the plaintiffs then waived their right to enforce the minimum purchase requirement in the 2000 agreement and, therefore, the plaintiffs were not entitled to any recovery based upon the defendant's alleged failures to meet the minimum purchase requirement for those years. In sum, the court found these conclusions dispositive of all of the plaintiffs' claims against the defendant. As to the defendant's counterclaims, although the court found that the plaintiffs had improperly terminated the 2000 agreement, it denied the defendant any relief on the ground that it had failed to prove its counterclaim damages with sufficient certainty, and that its claims for damages for lost profits for the plaintiffs' violation of the exclusivity clause in the 2000 agreement had been motivated by the filing of the present action by the plaintiffs and was, therefore, invalid.

On August 11, 2010, the plaintiffs appealed.[5] Thereafter, the defendant cross appealed. On July 1, 2011, the plaintiffs filed a motion for articulation. The court, however, denied the motion for articulation and the plaintiffs subsequently filed a motion for review with this court. This court granted in part the plaintiffs' motion to review and ordered the trial court to articulate whether its waiver finding was limited to the fourth

---

[5] The defendant filed a motion to reargue the judgment entered in favor of the plaintiffs on the defendant's counterclaims. The trial court granted the motion to reargue in part, finding that the defendant was entitled to recover its costs for the premiums it paid for the bond it obtained to secure the prejudgment remedy obtained by the plaintiffs. The trial court rejected the defendant's additional claims for reargument, concluding that "[t]he relationship and business history between the parties was such that no one can predict what sales and corresponding profits would have been made had the contract run its course."

and fifth contract years or extended to the remaining four years of the contract. This court also, sua sponte, ordered the trial court to articulate whether its waiver finding was intended to apply to the fourth and fifth years of the contract or to the fifth and sixth years. On December 22, 2011, the court issued an articulation, stating that it had found the plaintiffs' conduct to be "a waiver of the purchase requirements set forth in the original Agreement. This waiver extended to the entire period, up to June 21, 2006, and would also have extended throughout the remainder of the contract if the parties had continued to do business." The trial court further "corrected" its decision to state that the plaintiffs' conduct in the fifth and sixth contract years "amounted to a waiver of any right the plaintiffs have to claim that the defendant breached the [2000] agreement in either of those years, or in any year thereafter." Following the trial court's articulation, the defendant moved for further articulation, requesting that the trial court modify its articulation to provide that the plaintiffs' waiver occurred in the third, fourth and fifth years of the contract. In response to this motion, the trial court issued a reply correcting its articulation, and reverting to the language of its original decision finding that the conduct that gave rise to waiver occurred in the fourth and fifth years of the contract.

We first address the plaintiffs' claims that the trial court improperly found that the parties modified the 2000 agreement by their course of performance or alternatively agreed to a modification in writing, and, that in any event, the plaintiffs, by their conduct in contract years four and five, waived their right to claim that the defendant had breached the 2000 agreement for the duration of the 2000 agreement. We then turn our attention to the defendant's claim on its cross appeal regarding the court's determination that it failed to prove its claim for lost profits.

## I

## THE PLAINTIFFS' APPEAL

### A

### Modification

The plaintiffs first claim that the court improperly determined that the parties modified their 2000 agreement "through their course of performance" of a contract based on the parties' business needs. Specifically, the plaintiffs argue that the 2000 agreement required that any modification of its terms be in writing. The plaintiffs argue, as well, that this provision is consistent with the Uniform Commercial Code (UCC), General Statutes § 42a-1-101 et seq., specifically General Statutes § 42a-2-209. The defendant argues in response that the parties' agreement was modified by their course of performance and, nevertheless, there was ample evidence, as found by the court, of writings demonstrating that the parties modified their agreement. We agree with the plaintiffs.

The following additional facts are relevant to our resolution of this claim. During the second contract year of the 2000 agreement, the defendant's sales were down. Accordingly, the defendant invoked the downward adjustment clause in the 2000 agreement, which reduced its purchase obligations for that contract year from $6,184,200 to $4,354,295. The defendant met the lower purchase requirement for that year by purchasing approximately $5 million in products, which the plaintiffs accepted as full satisfaction of the defendant's purchase requirements for that year.

During the third contract year, the minimum purchase requirement was $6,323,345. The actual amount of product which the defendant intended to purchase during that year was discussed by the parties throughout the year. The plaintiffs ultimately agreed that

$6,101,761 in product purchases met the defendant's minimum purchase requirement for the third contract year, even though that amount was $221,584 lower than the minimum purchase requirement set forth in the parties' written agreement. The plaintiffs did not issue a shortfall notice for the third contract year.

For the fourth contract year, the 2000 agreement once again required the defendant to purchase $6,323,345 in Nice products. The parties, as in the previous year, discussed the amount of product that the defendant ultimately would purchase. When the parties met at the end of that contract year in February, 2004, the defendant announced that it anticipated invoking the downward adjustment clause to lower the minimum purchase requirement to $5.7 million. The defendant ultimately purchased only $4,512,707 of Nice products, $1,810,638 less than the contract required, and no official downward adjustment was ultimately agreed upon. At the time, the plaintiffs took no action to collect the additional $1.8 million the defendant was required to purchase.

By October, 2004, the parties began discussing the fifth contract year. Two days before a meeting scheduled with the defendant for October 29, 2004, Douglas Werner, an employee of the plaintiffs, e-mailed Bruce Whipple, another employee of the plaintiffs, who was to attend the meeting on behalf of the plaintiffs, with a list of projected figures and a contract "bogey," or minimum purchase requirement, of $7.2 million for the fifth contract year.[6] When presented with these figures, the defendant stated that it would only be able to purchase products valued in the aggregate amount of $5,129,490 for the fifth contract year. As the contract

---

[6] In his e-mail, Werner went on to state: "My plan is to present this to Bonnie Thomerson . . . . She knows that the contract bogey is $7.2 million. As we discussed last week we need to decide on what we are willing to let [the defendant] back off to."

year approached its end, the defendant had not yet purchased the $5.1 million in Nice product it had committed to purchase. The plaintiffs urged the defendant to make the additional purchases during the March, 2005 catch-up period to bring it to the $5.1 million commitment it had made, which the defendant eventually did meet.

By the middle of 2005, the relationship between the plaintiffs and the defendant had changed significantly. Internally, the plaintiffs reviewed their relationship with the defendant in May, 2004, and again in May, 2005, to determine whether they could terminate the 2000 agreement and take over the direct-to-market distribution of the Nice product line. At each of those junctures, the plaintiffs determined they were not ready to take the Nice product line directly to market. The plaintiffs did not share these internal discussions with the defendant.

Despite the deterioration in their relationship, the parties continued to do business in the sixth contract year. In late 2005, however, the plaintiffs had determined that they were ready to sell Nice products without a distributor. At the end of the sixth contract year, the defendant had purchased $5,341,976 of product. Consequently, the plaintiffs terminated the contract with a letter dated June 21, 2006, for "failure to pay the required [fifth] and [sixth] contract year shortfalls."

The question of whether the parties to a contract agreed to a modification of its terms is ordinarily an issue of fact. *Torgerson* v. *Kenny*, 97 Conn. App. 609, 616, 905 A.2d 715 (2006), cert. denied, 281 Conn. 913, 916 A.2d 54 (2007). The pertinent question for our resolution of the plaintiffs' claim, however, presents the legal issue of whether the parties' agreement limited their ability to make a modification without a writing. "A contract must be construed to effectuate the intent

of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. . . . Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct . . . ." (Citations omitted; internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, 73 Conn. App. 1, 8–9, 807 A.2d 991 (2002).

Here, the parties' 2000 agreement contained a written modification clause, which provided that: "No provision of this [agreement] may be waived or modified other than by a written instrument signed by the party against whom enforcement is sought." The legal effect of such a written modification clause is set forth in § 42a-2-209 (2), which provides in pertinent part that: "A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . ."[7] Nevertheless, in spite of the presence of a written modification clause in the 2000 agreement, the trial court found that the parties, "through their course of performance clearly modified the original terms of their agreement." Specifically, the court found that by the third contract year, the parties'

---

[7] In the official comment to UCC § 2-209, the purpose of subsection (2) is described as permitting "the parties in effect to make their own Statute of Frauds as regards any future modification of the contract by giving effect to a clause in a signed agreement which expressly requires any modification to be by signed writing."

conduct reflected a mutual agreement that the amount of product to be purchased was to be at a level consistent with the defendant's reasonably foreseeable business needs, as opposed to the minimum purchase requirement set forth in the 2000 agreement. On appeal, the defendant argues that we should affirm the trial court's judgment based on its finding that the parties engaged in a three year course of performance, during contract years three though five, that was "wholly inconsistent" with the minimum purchase requirement. This course of performance, the defendant contends, had the legal effect of modifying the 2000 agreement to eliminate the inconsistent minimum purchase requirement even in the presence of a written modification clause in the contract. We disagree.

General Statutes § 42a-1-303 (a) provides that a course of performance "is a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." Under § 42a-1-303 (d), "[a] course of performance . . . between the parties . . . is relevant in ascertaining the meaning of the parties' agreement . . . and may supplement or qualify the terms of the agreement." Section 42a-1-303 (f), however, provides that while "a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance," this is "[s]ubject to section 42a-2-209," which provides that the presence of a written modification clause limits the ability of parties to vary the terms of a contract except by a signed writing.

Applying these principles to the parties' 2000 agreement, we conclude that because the parties'

agreement had a written modification clause, the parties' course of performance, even if inconsistent with the terms of the contract, could not, as a matter of law, serve to modify their agreement. Accordingly, the court's determination that the parties modified their agreement through the course of their performance is legally incorrect.

Our analysis does not end here, however, because the trial court made an alternative finding that, in addition to the parties' course of performance, several writings by the plaintiffs demonstrated that the parties did, in fact, modify their agreement in writing. We are aware that whether the parties to a contract intended to modify the contract is a question of fact. *Torgerson* v. *Kenny*, supra, 97 Conn. App. 616. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 237–38, 963 A.2d 943 (2009).

The court found that the plaintiffs' reliance on the written modification clause was misplaced on the basis of its finding that writings by the parties constituted a modified agreement for each year of the contract in dispute. In support of this conclusion, the court referred to exhibits relating to the fifth year of the contract, which started in 2004. These exhibits consist of a series

of e-mails between employees of the plaintiffs and the defendant, discussing the defendant's need to make additional purchases to meet the level it had committed to for the fifth contract year. These e-mails do indicate that for the fifth year of the contract the defendant had declared a purchase commitment that was below the minimum purchase requirement. The e-mails also reflect, however, assertions from the plaintiffs reflecting their continuing insistence that the defendant adhere to the minimum purchase requirement as set forth in the 2000 agreement. For example, in two of the three e-mails cited by the court in its memorandum of decision, the plaintiffs included a status summary of the defendant's purchases and at the top of the summary was the line "[Fifth] Contract Year Bogey" followed by the amount of $7.2 million. The inclusion of the minimum purchase requirement amount in these e-mails indicates that the plaintiffs maintained that the contractual requirement was still in effect during the fifth contract year. At the very least, these e-mails do not demonstrate "mutual assent to the meaning and conditions of the modification" or that the parties assented "to the same thing in the same sense." (Internal quotation marks omitted.) *Torgerson* v. *Kenny,* supra, 97 Conn. App. 616.

On the basis of our review of the entire record, we conclude that there were no signed writings from which the court could properly conclude that the plaintiffs had agreed to modify the terms of the 2000 agreement. E-mails between the parties discussing various levels of purchasing forecasts and concerns regarding the defendant's ability to comply with the terms of the 2000 agreement do not reflect a modification to that agreement removing the defendant's annual minimum purchase requirement. Additionally, evidence that the plaintiffs issued shortfall invoices after both the fifth and sixth contract years indicates that the plaintiffs

never relieved the defendant of its minimum purchase obligation. Indeed, the evidence shows that as late as October and December, 2005, well into the sixth contract year, *the defendant* was seeking to have the 2000 agreement modified. The defendant's general counsel and vice president of sales both asked if the plaintiffs would consider transforming the 2000 agreement into a requirements contract.[8] If, as the defendant contends and the trial court found, the parties had already agreed to so modify the 2000 agreement, there would have been no reason for the defendant to ask the plaintiffs for such a modification at this late point in the life of that agreement.

Also lending support to our conclusion is the testimony of several of the defendant's employees that the parties had not modified the 2000 agreement. For example, Bonita J. Thomerson, an employee of the defendant who primarily handled the communication with the plaintiffs during years four and five of the 2000 agreement, testified that no written modification existed. The following exchange occurred at trial between the plaintiffs' counsel and Thomerson:

"Q. And we're talking here about oral discussions you had with [Michael S.] Gostomski [the plaintiffs' executive vice president]. I take it there was never any sort of writing that you entered into with Mr. Gostomski to modify the contract. Correct? There was never any writing that you entered into with Mr. Gostomski to modify the contract?

"A. The written contract, no.

"Q. Okay. You never discussed it orally and you never put any sort of modification down on paper or in writing. Right?

---

[8] "A requirements contract is one under which the seller agrees to sell and the buyer to buy all of the goods of a particular kind that the buyer may require in his business." (Emphasis omitted.) 1 E. Farnsworth, Contracts (3d Ed. 2004) § 2.15, p. 143.

"A. To modify the written. But we talked about, each year, the contract volume and agreements to that contract volume.

* * *

"Q. [Y]ou never sat down with Mr. Gostomski and said, listen, we need to change the $6 million number in the contract to something else, and this is what that number should be?

"A. He never brought it up. I would think he would take the initiative if that's what he wanted to do.

"Q. Okay. And you never brought it up?

"A. No.

"Q. And as a result, you never reached any sort of agreement with him on that point. Right?

"A. Well, if you don't bring it up, it can't be a point of discussion.

"Q. And it can't be a point of agreement. Right?

"A. That's correct."[9]

In sum, the defendant has failed to produce a signed writing by the plaintiffs, as required by the written modification clause of the 2000 agreement, which modified the minimum purchase requirement. Accordingly, we conclude that the court's factual finding to the contrary is clearly erroneous.

---

[9] Additionally, Jon H. Stevens, an employee of the defendant, testified that there was never a specific modification to the 2000 agreement eliminating the base amount. Scott Anderson, another employee of the defendant, testified that in his communications with the plaintiffs' employees regarding the agreement, they never presented a minimum amount to the defendant that was less than the minimum purchase requirement amount of $6 million or $7 million, depending on that year's base amount.

## B

### Waiver

The plaintiffs next claim that the trial court improperly found that the plaintiffs' conduct and writings amounted to a waiver of any right to claim that the defendant breached the 2000 agreement in the sixth contract year.[10] We agree.

Although "course of performance" evidence that parties to a contract attempted to modify their contract may fail for lack of a signed writing in the face of a written modification clause, such evidence "can operate as a waiver." See General Statutes § 42a-2-209 (4); 29 R. Lord, Williston on Contracts (4th Ed. 2000) § 73:22, p. 72 (noting difficulty in determining whether failed attempt at oral modification operates as waiver). "Waiver involves an intentional relinquishment of a known right. . . . Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so. . . . Furthermore, whether a waiver has occurred is a factual question for the trier. . . . Our review of the trial court's determination [therefore] is guided by the principle that, because waiver [is a question] of fact . . . we will not disturb the trial court's [finding] unless [it is] clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Banks Building Co., LLC* v. *Malanga Family Real Estate*

---

[10] At trial, the plaintiffs brought claims related to the fifth year of the contract and beyond. On appeal, the plaintiffs have elected not to pursue their claim related to the fifth year of the contract and, instead, ask this court to reverse the trial court's finding of waiver only as it applies to the sixth contract year and beyond. Consequently, while we examine the previous years of the contract as they relate to the trial court's finding of waiver for the fourth and fifth years of the contract and presumably beyond; see footnote 11 of this opinion; we focus our attention on whether the plaintiffs had waived their right to claim a breach for the sixth contract year.

*Holding, LLC*, 102 Conn. App. 231, 239, 926 A.2d 1 (2007).

Here, the trial court concluded that the plaintiffs' conduct in the fourth and fifth contract years amounted to a permanent waiver of their right to enforce the minimum purchase requirement.[11] The plaintiffs argue that to the extent that the trial court found waiver in the sixth contract year, that finding is without evidentiary foundation. We agree that there is insufficient evidence that for contract year six, the plaintiffs had waived their right to enforce the minimum purchase requirement. Instead, the evidence demonstrates that throughout the duration of the contract, the plaintiffs continued to insist that the defendant should be purchasing at the minimum purchase requirement level as set forth in the parties' 2000 agreement, but that due to the defendant's continued inability to meet that level, the plaintiffs "negotiated" with the defendant a purchasing commitment to ensure that the shortfall was within a range that would permit the plaintiffs to continue operations. In finding waiver, the court relied, as it did for its finding

[11] In its memorandum of decision, the court found that for the fourth and fifth contract years, the plaintiffs waived their right to enforce the minimum purchase requirement in the agreement. The court did not address the effect of this waiver finding on the plaintiffs' claim of breach for the sixth year of the contract or the duration of the contract term. In its articulation, the court stated that "[t]his waiver extended to the entire period, up to June 21, 2006, and would also have extended throughout the remainder of the contract if the parties had continued to do business." The trial court further "corrected" its decision to state that the plaintiffs' conduct in the *fifth and sixth* contract years "amounted to a waiver of any right [the plaintiffs have] to claim that [the defendant] breached the agreement in either of those years, or in any year thereafter." In response to a request for further articulation by the defendant, the court issued a reply correcting its articulation, and reverting to the language of its original decision finding that the conduct that gave rise to waiver occurred in the *fourth and fifth* years of the contract. The court did not appear to alter its articulation that this finding of waiver applied to the remaining years of the contract, including the sixth. Accordingly, we review the plaintiffs' claim that the court's finding of waiver for the sixth year is clearly erroneous.

of modification, on the fact that "[the plaintiffs] negotiated purchase agreements [for the fourth and fifth contract years] which it obviously knew were lower than the amounts provided for in the 2000 Agreement, and it failed to assert any timely claim for the alleged shortfalls." The trial court interpreted these negotiations between the parties as evidence that the plaintiffs had ceased to require the defendant to comply with the minimum purchase requirement, and, therefore, waived their rights to claim that the defendant breached the 2000 agreement by purchasing at lower levels. We note, however, that "[a] party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligation under the contract should not ordinarily lead to a waiver of the innocent party's rights. Certainly, if the party who did not commit the breach brings the complaints about the performance rendered or the failure to perform to the defaulting party's attention, and continues the relationship only on the assurance of better future performance, the nondefaulting party will not be barred from asserting his or her rights." (Footnote omitted.) 13 R. Lord, supra, § 39:35, pp. 655–56. That the plaintiffs chose to continue the contract, despite the defendant's shortfalls in the fourth and fifth contract years, does not, alone, support the conclusion that the plaintiffs waived their right to seek damages for the defendant's continued breach in the sixth year.

Moreover, as to the sixth contract year at issue in this appeal, the record contains an abundance of evidence demonstrating that the plaintiffs had not waived their right to full performance from the defendant in that year. The evidence demonstrates, as well, that the defendant was not operating under the impression that the plaintiffs had relinquished their contractual rights. See *Multiplastics, Inc.* v. *Arch Industries, Inc.*, 166 Conn. 280, 286, 348 A.2d 618 (1974) ("[T]he plaintiff

[did not] intentionally [acquiesce] in the defendant's breach of their agreement, thereby waiving its right to take advantage of that breach. Indeed, the plaintiff's repeated attempts to secure compliance seem inconsistent with the possibility of waiver."). Without evidence that the plaintiffs intentionally relinquished their right to the minimum purchase requirement, there is not a factual basis for the court's determination that the plaintiffs permanently waived the right to seek damages for the defendant's failure to meet minimum purchase requirements for the duration of the 2000 agreement. "[F]or conduct to amount to waiver or estoppel, it must not otherwise be compatible with the agreement as written; rather, the conduct of the parties [must] evidence an *indisputable mutual departure* from the written agreement." (Emphasis added; internal quotation marks omitted.) *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003).

In arriving at its factual conclusion regarding waiver, the court failed to consider that the plaintiffs had issued a shortfall notice to the defendant for the fifth contract year, indicating that they were holding the defendant responsible for the failure to purchase at the minimum purchase requirement level in that contract year. This shortfall notice, at the very least, indicated to the defendant that the plaintiffs intended to secure purchasing at the contractually specified level moving in the sixth contract year. On March 5, 2005, the very beginning of the sixth contract year, Scott Anderson, a marketing manager with the defendant, sent an e-mail to the defendant's internal service division regarding the 2000 agreement. In this e-mail, Anderson detailed the significant drop in Nice sales from 1999 to 2004 and reminded the division that: "We have a contractual obligation (through December 2008) relative to Nice product. *The contract includes a minimum annual purchase requirement to which we are now falling far short.* To

avoid the significant financial penalties associated with purchase shortfalls we must address the above to either reverse the trend or define a negotiation strategy to reduce the penalty." (Emphasis added.)

Additionally, the record reflects that throughout the sixth contract year, the plaintiffs were in constant communication with the defendant about the sixth contract year purchase requirement of over $7 million. For example, on August 10, 2005, a meeting took place between several employees of the plaintiffs and the defendant, at which the parties discussed the significant shortfall in the fifth contract year and the defendant's very low purchasing forecasts for the sixth contract year. After this meeting, follow-up letters between the parties show escalating concern by the plaintiffs that the defendant was again going to fall significantly short of the 2000 agreement minimum and that the plaintiffs were seeking to have the defendant comply.[12] A letter was sent on September 30, 2005, from the plaintiffs to the defendant, concerning the "[Fifth] Contract Year Short Fall and [Sixth] Contract Year Forecast." The letter details that the defendant issued a forecast on September 8, 2005,

---

[12] Additional internal communications from the defendant's employees to one another indicated that they were under the impression that the minimum purchase requirement was in place in the sixth year. In an e-mail during July of the sixth contract year from Maria Veron, a supply services manager with the defendant, to William Moore, a senior vice president with the defendant, Veron states that "I don't know if you are aware of this, but [the defendant's] contract with Nice requires [the defendant] to purchase 7 million dollars of product during the contract year. . . . We successfully negotiated the bogey down to $5 million dollars for the year ending March 1, 2005. However, to meet the 5 million dollar bogey we had to purchase 3 million dollars worth of product between January and March. At this time there is still 2.3 million dollars of Nice product in stock . . . . We not only have to sell this product but we have to start purchasing product to meet next year's contract requirement." Another e-mail from Thomerson in September, 2005, titled "RBC Issues", encouraged another employee of the defendant that "You might want to provide input to any incentives to promote this product . . . . The [sixth] contract year is 7.1 [million] approximately."

showing that: "[the plaintiffs'] shipments to [the defendant] through September [2005] are $1,318,344. When these shipments are combined with [the defendant's] forecast of $1,340.288.99 from October 2005 through March 2006 they yield a [Sixth] Contract year amount $2,658,633.13 yielding an anticipated [Sixth] Contract year shortfall of $4,454,163.87 ($7,112,797–$2,658,633.13)." The letter further explained that the issues related to the contract year obligations and shortfalls "are critical."

The parties' representatives met again on October 6, 2005, to discuss the unpaid shortfall invoice from the fifth contract year and an e-mail from the defendant stating that it would only make purchases "based on need." At this meeting, which was attended by William Moore, the defendant's senior vice president, and Timothy Gifford, the defendant's general counsel, Moore asked the plaintiffs if they would consider converting the 2000 agreement into a requirements agreement. The parties discussed the idea but did not come to any agreement. After this meeting, for the first time, Gifford informed the plaintiffs that the defendant believed, not that the minimum purchase requirement had been waived, but that the downward adjustment that was applicable in the second contract year had permanently reduced all future purchase requirements. In this e-mail, Gifford asserted again that the defendant was "open to all discussions regarding how we might convert that Supply contract to a requirement contract."

In sum, and contrary to the court's finding, the record does not support a factual conclusion that the plaintiffs "clearly indicated that [they] acquiesced" in the defendant's disregard of the minimum purchase requirement, especially for the sixth year of the contract. Cf. *Bradford Novelty Co.* v. *Technomatic, Inc.*, 142 Conn. 166, 170–71, 112 A.2d 214 (1955) (finding that conduct of

plaintiff clearly indicated that it acquiesced in defendant's delay and would not require rigid adherence to dates specified for completion of performance). Instead, in the sixth year, the record makes plain that the plaintiffs consistently and clearly indicated not only that they were they seeking to have the shortfall for the fifth year made up, but also that they were very concerned about the defendant meeting the contract requirement for the sixth year. Therefore, we conclude that in light of the abundance of evidence that the plaintiffs repeatedly attempted to secure the defendant's compliance with the minimum purchase requirement during the sixth year, the court's finding of waiver of that requirement for the sixth contract year is clearly erroneous. Accordingly, we reverse the judgment of the trial court with respect to the plaintiffs' breach of contract claims.

## II

### THE DEFENDANT'S CROSS APPEAL

We turn now to address the defendant's second claim in its cross appeal,[13] namely, that it was entitled to damages in the form of lost profits of $77,915 on direct sales of Nice product made by the plaintiffs in violation of the exclusivity clause in the 2000 agreement. This claim stems not from the court's erroneous conclusion that the plaintiffs breached the 2000 agreement by early termination, but rather from evidence of the plaintiffs' actions during the life of the contract in making certain direct sales of Nice products to customers in violation of the defendant's exclusive right to sell. We agree with the defendant's claim in this regard.

The following additional facts are relevant to our resolution of this claim. The 2000 agreement granted the defendant a distributorship in which it would own

---

[13] See footnote 2 of this opinion.

the exclusive right to sell Nice products to distributor customers in the industrial aftermarket. In its counter-claim, the defendant alleges that despite the exclusivity provision in the 2000 agreement, the plaintiffs sold Nice products directly to the defendant's customers through-out the life of the 2000 agreement, generating revenue of more than $1.5 million. The defendant alleges that it suffered $77,915 in lost profits as a result of the plaintiffs' direct sales to distributor customers. The court found that the defendant was not entitled to recover damages for lost profits based on two related conclusions. First, the court noted that all of the defen-dant's claims for damages, including its lost profits claim, "share a common problem: they are based on so many variables and contingencies that the court cannot assess damages on any of them by a preponderance of the evidence." Second, specifically addressing the lost profits claim, the court noted that these improper direct sales were only "a small matter of contention between the parties while they were doing business together" and found that "the amount in dispute did not become a significant issue between the defendant and the [plain-tiffs] until litigation was being contemplated."

We begin our analysis with a review of our law on lost profits damages arising out of a breach of contract generally. "[O]ur case law unequivocally supports awarding lost profits as an element of compensatory damages for general breach of contract claims. The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . The Restatement (Second) of Con-tracts divides a defendant's recovery into two compo-nents: (1) direct damages, composed of the loss in value to him of the other party's performance caused by its

failure or deficiency; 3 Restatement (Second), Contracts § 347 (a) (1981); plus, (2) any other loss, including incidental or consequential loss, caused by the breach . . . . Id., § 347 (b). Traditionally, consequential damages include any loss that may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself. . . . Although there is no unyielding formula by which damages are calculated, it is our rule that [u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." (Citations omitted; internal quotation marks omitted.) *Ambrogio* v. *Beaver Road Associates*, 267 Conn. 148, 155, 836 A.2d 1183 (2003).

"It is incumbent on the party asserting either direct or consequential damages to provide sufficient evidence to prove such damages. . . . Further, [w]hen damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Citation omitted; internal quotation marks omitted.) *Sullivan* v. *Thorndike*, 104 Conn. App. 297, 304, 934 A.2d 827 (2007), cert. denied, 285 Conn. 907, 908, 942 A.2d 415 (2008). "[T]he determination of damages involves a question of fact that will not be overturned on appeal unless it is clearly erroneous." *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 838, 3 A.3d 992 (2010). "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Emphasis omitted; internal quotation marks omitted.)

*Baron* v. *Culver & Associates, LLC,* 106 Conn. App. 600, 602, 942 A.2d 552 (2008).

Initially, we agree with the defendant that it is legally irrelevant to the validity of the defendant's counterclaim that it did not, as the court found, "plan to pursue any such claim until such time as the contract was terminated and it started formulating its litigation strategy." A party's motive for pursuing a breach of contract claim is irrelevant to whether a party has demonstrated with reasonable certainty the amount of damages. Therefore, the court's determination that the defendant had not proved its claim for damages on the basis that it did not plan to pursue any claim until the contract was terminated is erroneous.

The plaintiffs argue that the defendant's claim for lost profits was properly rejected because the defendant failed to prove that it would have made the product sales that the plaintiffs had made in violation of the exclusivity clause. Specifically the plaintiffs contend that unless the defendant can prove that it would have made the sales if the plaintiffs had not pursued the aftermarket customers, it cannot show that the plaintiffs' breach of the exclusivity clause was the *cause* of the damages. We recognize that "[a]lthough there is no unyielding formula by which damages are calculated, it is our rule that [u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." (Internal quotation marks omitted.) *Sullivan* v. *Thorndike,* supra, 104 Conn. App. 304. Here, there was evidence that provided the court a sufficient basis to estimate the amount of damages with reasonable certainty. Although the defendant may not be able to prove absolutely that every aftermarket customer who purchased product from the plaintiffs would have purchased the same product from the defendant, in order to assess damages,

the defendant could satisfy its burden of proving damages by demonstrating that these lost profits were a "natural consequence of [the plaintiffs'] breach" of the exclusivity clause. (Internal quotation marks omitted.) Id.

Under these circumstances, it would be neither speculative nor too remote for the court to conclude that the defendant, the exclusive distributor of certain Nice product, would have been in the position to sell the product to the customers who purchased directly from the plaintiffs. The defendant presented evidence of approximately seventy-five different companies that purchased Nice product directly from the plaintiffs during the years 2000 to 2006. That list included companies that were already the defendant's customers and others that, although not the defendant's customers in the years in question, could have readily become customers in the defendant's normal course of business conduct had the plaintiffs not sold directly to them. Finally, the defendant also presented documentation of all the sales of Nice product made by the plaintiffs, during the life of the parties' agreement, to those seventy-five companies. On the basis of this evidence, we cannot agree that the defendant's claim is "based on so many variables and contingencies" that the court could not assess damages. See *Message Center Management, Inc.* v. *Shell Oil Products Co.*, 85 Conn. App. 401, 421, 857 A.2d 936 (2004) (testimony as to lost profits based on past and similar sales sufficiently reliable).

We do recognize, however, that there is some dispute between the parties as to the definition of "Nice products" as contained in the exclusivity clause of the 2000 agreement. The plaintiffs contend that "Nice products" referred only to the specific bearings listed on Schedule 1 of the 2000 agreement, whereas the defendant contends that the exclusivity clause extended to all Nice-branded bearings, regardless of their inclusion on

Schedule 1. This determination is relevant to the amount of lost profits the defendant may recover based on whether it can only recover lost profits for direct sales made by the plaintiffs of Nice products listed on Schedule 1 or of any direct sales made by the plaintiffs of Nice products, regardless of their inclusion on Schedule 1. We agree with the plaintiffs that the defendant cannot recover lost profits on items for which it was not contractually the exclusive distributor and that the language of the 2000 agreement specifically defines "Nice Products" as including: "A listing of all of such Nice Products . . . is set forth on Schedule 1. Nice Products do not include any other products made by or for [the plaintiffs], its parent or affiliates unless the Parties, by mutual agreement, add such products to Schedule 1." On remand, therefore, the court must determine the amount of damages to which the defendant is entitled based on the products listed in Schedule 1 of the 2000 agreement.

The judgment in favor of the defendant with respect to the plaintiffs' breach of contract claim is reversed and the case is remanded for a new trial. The judgment in favor of the plaintiffs on the defendant's counterclaim for lost profits is reversed and the case is remanded with direction to render judgment in favor of the defendant on that counterclaim and for further proceedings to determine an award in damages.

In this opinion the other judges concurred.