**GETTY TERMINALS CORP., Plaintiff-Appellee–Cross–Appellant,**

v.

**COASTAL OIL NEW ENGLAND, INC., Defendant–Appellant–Cross–Appellee.**

Nos. 859, 1064, Dockets 92–7935, 92–7979.

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1993.

Decided June 10, 1993.

Igor Krol, New York City, (Eric M. Freedman, Alona Magidova, Krol & O'Connor, New York City, of counsel), for defendant-appellant-cross-appellee.

Robert G. Del Gadio, Uniondale, NY, for plaintiff-appellee-cross-appellant.

Before: MESKILL, Chief Judge, FEINBERG and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Coastal Oil New England, Inc., a Massachusetts corporation, appeals from Judge Martin's award after a bench trial of $434,960 plus interest to Getty Terminals Corp., a New York corporation, for taxes it billed to Coastal. Coastal argues that the district court misapplied the New York Uniform Commercial Code ("UCC"). In particular, Coastal contends that, because the agreement between the parties was silent on the payment of taxes, the district court erred by: (1) relying on usage of trade for the payment of taxes rather than the course of dealing between the parties, and (2) ignoring the requirement of Section 2–209 that the retraction of a waiver requires notice. *See* N.Y.U.C.C. Law § 2–209(5) (McKinney 1964).[1] We hold that Getty had waived its right to bill Coastal for taxes and was required to give notice of the retraction of its waiver. We therefore reverse.

## BACKGROUND

Coastal and Getty are wholesalers of petroleum products. They entered into an exchange agreement on July 24, 1987, that provided Getty with access to Coastal's terminal facility in Revere, Massachusetts and Coastal with access to Getty's terminal facility in South Portland, Maine. The agreement was negotiated by telephone between William Rea, a trader employed by an affiliate of Getty, and Lou DeRosa, a trader employed by an affiliate of Coastal, and was confirmed by a one-page telex. The agreement provided that Coastal would pay Getty $0.0037 for each gallon lifted by Coastal from Getty's Maine terminal as a location differential, *i.e.*, the difference in the distance of each party's terminal from New York. Differentials were to be settled at the end of each calendar month. The agreement also provided for a "30 day evergreen" term, *i.e.*, unless terminated by either party, the agreement would automatically extend for another thirty days.

Although it was anticipated that the parties would exchange equal quantities of gasoline each month, Getty's requirements in Massachusetts far exceeded Coastal's requirements in Maine. As a result, the parties agreed at the end of 1989, through telephone conversations between Rea and Coastal trader Kenneth Sly, to settle the imbalance accrued through October 31, 1989. Pursuant to this agreement, Coastal sent provisional invoices to Getty on December 29, 1989, and January 9, 1990, and a final invoice on January 18, 1990, for the imbalance of shipments prior to October 31, 1989. The first two invoices provided "that this invoice is a provisional settlement and subject to final adjustment regarding taxes, quantities, grades, pricing, differential, [and] thruput charges."

The parties also agreed to account, at the end of each month, for future imbalances on the basis of a flat price per gallon and a handling differential, known as a "thruput" charge, which is the fee paid to a terminal operator for use of the terminal for receiving gasoline. The party who received the greater quantity of gasoline would pay to the other party a handling differential of $0.0060 per gallon on that portion of the gasoline which represented an imbalance during a particular month.

1. Coastal alternatively argues that if we affirm Judge Martin's decision, we should remand to permit Coastal to obtain payment from Getty for back taxes. Getty cross-appeals for a higher interest rate on the judgment and for attorney's fees. We need not reach either Coastal's alternative argument or Getty's cross-appeal.

The genesis of the present dispute occurred in 1990, when Maine significantly increased license fees that it charged oil terminal facilities. This was accomplished by amendments to two statutes. The first statute, the Maine Coastal and Inland Surface Clean-up Fund, was enacted in 1969 and required every oil terminal facility to pay, as a condition of its license, $0.005 per barrel of gasoline transferred. *See* Me.Rev.Stat. Ann. tit. 38, § 551(4)(A), (D) (West 1989 & Supp. 1992). The statute was amended in 1989, effective April 19, 1990, to provide for license fees of $0.04 per barrel of gasoline until February 1, 1991, and $0.03 per barrel after that date.

The second statute, the Ground Water Oil Clean–Up Fund, was enacted in 1985. *See* Me.Rev.Stat.Ann., tit. 38, § 569(4)(A) (West 1989). This statute required oil terminal facilities to pay, as a condition of their license, $0.03 per barrel of gasoline first transferred in Maine. The statute was amended to require a license fee of $0.09 per barrel effective July 10, 1989, and effective May 1, 1990, a higher fee of $0.44 per barrel. Both statutes called for monthly remittances of fees by licensed oil terminal facilities.

Beginning in July 1991, Getty included in its monthly bill to Coastal the Maine fees and billed Coastal for a reimbursement of the fees paid to Maine from June 1990 through June 1991. Coastal refused to pay the fees and this lawsuit followed.

At trial, the parties agreed that the original 1987 agreement did not mention taxes, and none of Getty's monthly exchange statements made any reference to taxes. The parties also agreed that, until July 1991, neither party billed the other party for taxes. Rather, each party paid all taxes without passing on the expense to the other.

The district court found that the telex did not represent all the terms and conditions of the agreement and admitted parole evidence. The court held that the agreement between the parties was intended "to keep these parties whole. This was to be a wash transaction." The court also found that it was the custom and usage in the industry to pay such taxes. As to waiver, the court held although

it is true that Getty did not, prior to the sharp increase in the taxes, pass on those taxes to Coastal[,] there is no reason to believe that this was anything more than a de minimis amount and was not considered significant by either party. That does not change the contemplation of the parties that a significant tax burden would be borne by the person who actually took delivery of the product.

Finally, the court found that Coastal had "not produced any evidence that it could have or would have attempted to pass this tax burden on to its customers or that it could have, given the economics of the market in which it was operating."

## DISCUSSION

■ Coastal argues first that the agreement did not require the purchaser to pay taxes, as demonstrated by the silence of the telex on the issue and by the course of performance of the parties. However, this is irrelevant given our disposition of the appeal because, even assuming the contract provided for the payment of taxes, Getty waived the right to bill Coastal for such taxes and did not comply with the UCC in retracting its waiver.[2]

Section 2–209(5) of the UCC states:

A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

N.Y.U.C.C. Law § 2–209(5) (McKinney 1964). Getty admits that at all pertinent times Maine imposed fees but that it did not bill Coastal for any such fees, including licensing fees, until July 1991. Getty thereafter requested reimbursement for the taxes it paid to Maine beginning in June 1990, after

**2.** The district court's finding regarding taxes is not necessary to give meaning to the contract for future purposes because the parties have agreed to reimburse each other for taxes subsequent to June 1991.

the licensing fees imposed by Maine had been substantially increased.

Given Getty's view that it was entitled to bill Coastal for taxes and fees, the failure to render such bills for over four years constituted a waiver, that is, an intentional abandonment of its right to bill Coastal for taxes. Getty knew that licensing fees were charged at all pertinent times, and it deliberately chose not to bill for them. Getty argues that no waiver occurred because the fees were initially de minimis, whereas it began such billing only after the fees were substantially increased. (Actually, it began such billing over a year after that increase.) However, the fact that the fees were originally de minimis (and perhaps substantially a wash in light of taxes paid to Massachusetts by Coastal) provides only the motive for the waiver and does not vitiate the waiver itself. Whether a tax is de minimis or substantial turns on Getty's private evaluation of its economic impact. In light of Section 2–209(5), Coastal was surely not obliged to track Maine's licensing fees and to anticipate Getty's evaluation of them. To the contrary, once Getty's evaluation changed, it was obliged by Section 2–209(5) to notify Coastal. That section would have little effect if a party were free to avoid giving notice of a retraction of a waiver because in its private opinion the reasons for a waiver no longer obtained. The failure to bill Coastal for the licensing fees over a four-year period thus constituted a waiver of the right to bill for such taxes and fees and required Getty to "retract the waiver by reasonable notification received by the other party that strict performance will be required." *Id.*

Contending that Coastal must show prejudice to prevail, Getty argues that the failure to bill Coastal for the Maine license fees did not prevent Coastal from passing these costs on to its customers because Coastal would have had to sell the gasoline at a market price beyond its control. The district court similarly found that a showing of prejudice was required and was lacking. We disagree that such a showing is necessary. We find no trace of a requirement that prejudice be shown in either the language of Section 2–209(5) or the accompanying commen-

tary. What the section does recognize is that we cannot reconstruct ex post precisely what a party in Coastal's position would have done if it had advance notice that Getty was retracting its waiver and that the failure to give notice will cause parties such as Coastal to forego even consideration of other options. *See Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1337 (7th Cir. 1991) (holding that seller could not bill buyer for eight years of back taxes seller was now forced to pay by state tax authorities because buyer lost right to "decide to cease buying" from seller or to switch to other suppliers). To avoid those consequences, Section 2–209(5) requires timely notice of a retraction of waiver.

We therefore reverse.