******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

RBC NICE BEARINGS, INC., ET AL. *v.* SKF USA, INC.
(SC 19253)

Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued January 5—officially released September 22, 2015*

*David Richman*, pro hac vice, with whom were *Matthew D. Janssen, Robert B. Flynn* and, on the brief, *Steven J. Zakrzewski*, for the appellant (defendant).

*Kim E. Rinehart*, with whom were *Tadhg A.J. Dooley* and, on the brief, *Joseph W. Martini* and *Matthew C. Brown*, for the appellees (plaintiffs).

*Opinion*

ESPINOSA, J. This appeal arises from a dispute over a contract for the sale of goods. The plaintiffs, RBC Nice Bearings, Inc., Roller Bearing Company of America, Inc., and Roller Bearing Company of America, Inc., doing business as Nice Ball Bearings, Inc., manufacture industrial ball bearings. They appealed to the Appellate Court from the judgment of the trial court, which had denied the plaintiffs' claim for contractual damages on the basis of its finding that the plaintiffs had waived a contractual requirement that the defendant, SKF USA, Inc., a distributor, purchase a minimum dollar value of bearings from the plaintiffs each year. See *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 146 Conn. App. 288, 294, 78 A.3d 195 (2013). The Appellate Court reversed the trial court's judgment, concluding that, even if there was sufficient evidence to support a finding that the plaintiffs had waived the minimum purchase requirement as to certain years of the contract, the trial court's finding that the waiver continued into subsequent contract years was clearly erroneous. Id., 310–11. We subsequently granted the defendant's petition for certification to appeal, limited to the following questions: (1) "Did the Appellate Court properly determine that the judgment of the trial court should be reversed or did it substitute its judgment for that of the trial court when it determined that the conduct of the parties did not give rise to a waiver of the minimum purchase requirement?"; and (2) "Did the Appellate Court properly determine that the trial court incorrectly decided that the [plaintiffs] failed to retract [their] waiver of [the defendant's] minimum purchase requirement . . . ?" *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 310 Conn. 962, 963, 83 A.3d 345 (2013). With respect to the second certified question, we conclude that certification was improvidently granted.[1] With respect to the first certified question, we conclude that the record contained sufficient evidence to support the trial court's finding that the plaintiffs waived the minimum purchase requirement on a continuing basis. Accordingly, we reverse in part the judgment of the Appellate Court.[2]

The decision of the Appellate Court, as supplemented by the record, reveals the following factual background and procedural history. The defendant owned Nice Ball Bearings, Inc. (Nice), producer of the oldest line of ball bearings manufactured in the United States, until 1997, when it sold the product line and associated manufacturing assets to the plaintiffs. *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 291. "The parties simultaneously executed a 'Sales and Supply Agreement' (1997 agreement) through which the defendant became the plaintiffs' exclusive distributor for certain Nice products [to certain aftermarket customers]. The 1997 agreement provided for a term of eight years and required that the defendant expend, at a minimum,

$9 million for the purchase of Nice products from the plaintiffs each year." Id.

Although the defendant failed to purchase the contractual minimum during the first three years of the 1997 agreement, the plaintiffs did not demand compliance with the minimum purchase requirement, nor did they take any steps to challenge the defendant's failure to comply with that requirement. Id. Rather, on July 31, 2000, the parties negotiated a new sales and supply agreement to reflect what they agreed were changed market realities (2000 agreement). Id. This 2000 agreement superseded the 1997 agreement. Id. It extended the term of the parties' exclusive supply relationship through the end of 2008, while lowering the minimum purchase requirement by providing that the defendant was required to buy not less than $6 million per year of Nice products. Id. The 2000 agreement also contained an adjustment clause that allowed for future increases in the minimum annual purchase requirement to reflect price increases in the marketplace. Id., 291–92. The new agreement also allowed for downward adjustments in the minimum purchase requirement under certain exceptional circumstances outlined in the agreement. Id., 292.

Each contract year was designated to run from March 1 to the end of the following February.[3] Id. The 2000 agreement provided that, if a deficit remained after the close of a given contract year, the defendant could designate a portion of its March sales during the following year toward making up the shortfall. Id. In any event, the defendant would be required to purchase enough Nice product to make up the shortfall by April 30 of the following year. Id. The 2000 agreement also provided, however, that, upon the expiration or termination of the agreement, the plaintiffs were obligated to repurchase from the defendant all salable Nice products in the defendant's inventory. Finally, the 2000 agreement retained the defendant's exclusive distributorship, under which it held exclusive rights to sell Nice products to certain industrial aftermarket customers. Id.

During the first year of the 2000 agreement, the defendant purchased the required amount of bearings from the plaintiffs. Id. Although its purchases in the second contract year fell short of the $6 million minimum, this shortfall was contractually excused because the terrorist attacks of September 11, 2001, resulted in a significant falloff in demand for industrial bearings in the second half of the contract year.

For reasons that are disputed by the parties, the defendant was unable to satisfy its minimum purchase requirements during the third through sixth years of the 2000 agreement. The shortfalls amounted to $221,584 in the year ending February 28, 2003; $1,810,638 in the year ending February 29, 2004; $2,150,515 in the year ending February 28, 2005; and approximately $2 million

in the year ending February 28, 2006.

In the third through fifth years of the 2000 agreement, the plaintiffs, as they had under the 1997 agreement, continued to perform under the contract despite the defendant's repeated failure to meet its contractual obligations. They indicated their acceptance of the defendant's deficient performance, and they forbore from demanding compliance with the minimum purchase requirement, invoicing the defendant for the shortfalls, or taking any legal action to enforce their contractual rights. Instead, each year, while continuing to remind the defendant of its contractual obligations, the plaintiffs negotiated with the defendant a purchase requirement that the defendant believed the market reasonably could bear. During this period, in the interest of maintaining a solid business relationship between the parties, the defendant also overlooked or tolerated various deviations by the plaintiffs from their contractual requirements. For example, the defendant allowed the plaintiffs to fill its orders at a fill rate lower than provided for in the 2000 agreement, and also to increase prices earlier than the agreement permitted.

The plaintiffs adopted a different strategy, however, midway through the sixth contract year, which began on March 1, 2005. The plaintiffs had, for some time, been exploring the possibility of terminating the 2000 agreement with the defendant, cutting out the middleman, and taking over direct-to-market distribution of Nice bearings. The plaintiffs never revealed these plans to the defendant. Their internal target date for the transition was the end of 2005. Accordingly, in July, 2005, Michael Hartnett, the plaintiffs' president and chief executive officer, instructed Bruce Whipple, his director of business development, as follows: "I want to run Nice at a rate this year that does not create a major inventory hangover problem [and] I *don't* want to end the contract this year. Play nice! But let's reserve our claim." (Emphasis in original.)

Pursuant to this new strategy, on August 10, 2005, the plaintiffs presented the defendant with a $1.6 million shortfall invoice for the fifth contract year. Still, despite the defendant's failure to make up the shortfall, the plaintiffs continued to sell Nice bearings to the defendant under the contract through the end of the sixth contract year on February 28, 2006. When the defendant again failed to purchase the contractual minimum by the end of March, 2006, the plaintiffs issued a shortfall invoice for the sixth contract year. *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 302. Finally, in June, 2006, the plaintiffs unilaterally terminated the 2000 agreement.

"On June 22, 2006, the plaintiffs commenced this action against the defendant for [among other things] failure to meet its contractual obligations under the 2000 agreement in the fifth and sixth contract years

and for the anticipatory breach of contract in years seven through nine. . . .[4] In [a] counterclaim, the defendant alleged breach of contract, tortious interference with contractual relations and prospective business relations, unjust enrichment, promissory estoppel, and violations of [the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.]." (Footnote added.) Id., 293.

"After a trial to the court [*Miller, J.*], the court issued a memorandum of decision in which it ruled in favor of the defendant on the plaintiffs' claims and in favor of the plaintiffs on the defendant's counterclaims. The court concluded that the evidence presented clearly demonstrated that the 2000 agreement had been modified by the conduct of the parties, who for most of the contract period did not follow the annual sales requirements set forth therein, and instead negotiated mutually acceptable, annual purchase volumes based on the realities of the market and on their business capacities. . . . [In the alternative, the] court found that for the fourth and fifth contract years, the plaintiffs . . . waived their right to enforce the minimum purchase requirement in the 2000 agreement . . . ." (Internal quotation marks omitted.) Id., 293–94. These conclusions were based, in part, on the court's findings that: (1) the testimony of the defendant was more credible than that of the plaintiffs; and (2) there was "close to overwhelming" evidence that the plaintiffs merely used the defendant's contractual shortfalls as a pretext to terminate the agreement once they were ready to assume direct distribution of the Nice product line.

The trial "court found these conclusions dispositive of all of the plaintiffs' claims against the defendant." *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 294. As to the defendant's counterclaim that the plaintiffs had violated the exclusive sales clause of the 2000 agreement, although the court found that the plaintiffs had breached the agreement, it denied the defendant any relief on the grounds that: (1) the defendant had failed to prove its counterclaim damages with sufficient certainty; and (2) "the amount in dispute did not become a significant issue between the defendant and the [plaintiffs] until litigation was being contemplated." (Internal quotation marks omitted.) Id., 312.

On appeal, the Appellate Court reversed the judgment of the trial court as to both the plaintiffs' breach of contract claims and the defendant's counterclaim. Id., 316. With respect to the plaintiffs' claims, the Appellate Court concluded that, as a matter of law, any modification of the agreement by the parties' course of performance was barred by a provision of the 2000 agreement requiring that any modification of its terms be in writing. Id., 296, 300–301. The Appellate Court further concluded that "there were no signed writings from which the [trial] court could properly conclude that the plaintiffs

had agreed to modify the terms of the 2000 agreement."[5] Id., 302. In addition, the Appellate Court concluded that the trial court's finding that the plaintiffs waived the minimum purchase requirement in the sixth contract year was clearly erroneous. Id., 311. Accordingly, it remanded the case for a new trial. Id., 316. With respect to the defendant's counterclaim, the court concluded that the defendant's damages could be calculated without speculation, and that the defendant's motive for pursuing the claim was irrelevant. Id., 314–15. Accordingly, the Appellate Court remanded the case with direction to render judgment in favor of the defendant on its counterclaim and for further proceedings to determine the amount of damages to which the defendant was entitled. Id., 316. The sole issue we consider in this certified appeal is whether the Appellate Court properly concluded that the trial court's finding of a continuing waiver of the minimum purchase requirement as to the sixth contract year and the executory portions of the agreement was clearly erroneous. Additional facts will be set forth as necessary.

We begin our analysis with a brief overview of the relevant legal principles. We then consider whether the trial court's findings as to waiver in the third through fifth contract years were clearly erroneous, and, finally, whether its finding of continuing waiver as to the sixth and subsequent contract years was clearly erroneous.

"Waiver is a question of fact. . . . [When] the factual basis of the [trial] court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . [T]he trial court's conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case." (Citations omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, 272 Conn. 617, 622–23, 866 A.2d 582 (2005).

Contracts for the sale of goods are governed by the Uniform Commercial Code (UCC), which Connecticut has codified at General Statutes § 42a-1-101 et seq. Although the UCC contains numerous references to the "waiver" of contractual requirements, it never defines the term waiver; see General Statutes § 42a-2-103 (definitions and index of definitions in article 2 of UCC); *Dynamic Machine Works, Inc.* v. *Machine & Electrical Consultants, Inc.*, 352 F. Supp. 2d 83, 88 (D. Mass. 2005); nor does it set forth standards for determining whether a party to a contract has waived its contractual rights. To determine the existence and contours of a purported waiver, therefore, we must seek guidance from our state's common law of contract, as supplemented by the UCC. See General Statutes § 42a-1-103 (b); Conn.

Gen. Stat. Ann. (West 2009) § 42a-1-103, comment (2), pp. 21–22; *Boston Helicopter Charter, Inc.* v. *Agusta Aviation Corp.*, 767 F. Supp. 363, 372 (D. Mass. 1991).

Waiver is defined generally as "the voluntary relinquishment of a known right." *MacKay* v. *Aetna Life Ins. Co.*, 118 Conn. 538, 547, 173 A. 783 (1934). In the contract context, waiver refers to "the excuse of the nonoccurrence of or a delay in the occurrence of a condition of a duty." 2 E. Farnsworth, Contracts (3d Ed. 2004) § 8.5, p. 447. "Waiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . [W]aiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) *AFSCME, Council 4, Local 704* v. *Dept. of Public Health*, supra, 272 Conn. 623. Accordingly, although an "[i]ntention to relinquish must appear . . . acts and conduct inconsistent with [the] intention to terminate the contract are sufficient." (Internal quotation marks omitted.) *MacKay* v. *Aetna Life Ins. Co.*, supra, 547–48.

With respect to contracts governed by the UCC, General Statutes § 42a-1-303 (f) provides in relevant part that "a course of performance is relevant to show a waiver . . . of any term inconsistent with the course of performance."[6] Indeed, "it is a settled principle of contract law that a party to an executory bilateral contract waives a material breach by the other party if he continues the business relationship, and accepts future performance without some warning that the contract is at an end." (Internal quotation marks omitted.) *Apex Pool Equipment Corp.* v. *Lee*, 419 F.2d 556, 561 (2d Cir. 1969); see also 2A L. Lawrence, Anderson on the Uniform Commercial Code (3d Ed. 2008) § 2-209:99, p. 75; 13 R. Lord, Williston on Contracts (4th Ed. 2000) § 39.31, pp. 637–42.

Once it is determined that an obligee has waived the performance of one or more of the obligor's contractual duties, the question arises as to the scope and extent of that waiver. See 2A L. Lawrence, supra, § 2-209:56, p. 53. For example, when a contract provides that an obligor will satisfy its contractual duties in instalments, or provides for repeated occasions of performance, the fact that the obligee waives the obligor's noncompliance as to a single instalment, or on one particular occasion, does not necessarily evidence an intent to waive noncompliance as to the obligor's future, executory obligations. See *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003); 2A L. Lawrence, supra, § 2-209:57, p. 54. Rather, for a course of performance to give rise to a continuing waiver, there must be "repeated occasions for performance and [the] opportunity for objection . . . ." (Emphasis omitted; internal quotation marks omitted.) *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, supra, 783; see, e.g., *Bradford Novelty Co.* v. *Technomatic, Inc.*, 142 Conn. 166, 170–71, 112 A.2d 214

(1955) (by repeatedly acquiescing in previous delays, obligee waived its right to insist on strict compliance with contractual provisions as to time of performance); *Remington Arms Union Metallic Cartridge Co.* v. *Gaynor Mfg. Co.*, 98 Conn. 721, 731, 120 A. 572 (1923) (by accepting noncompliant deliveries for fourteen months, obligee abandoned right to peremptorily put end to further performance by obligor without first giving obligor reasonable notice of its intention to demand strict performance in future); *Bronson* v. *Leibold*, 87 Conn. 293, 297, 87 A. 979 (1913) (by accepting multiple noncompliant payments, obligee waived right to insist on forfeiture for noncompliance). Whether the obligee's repeated waiver of a contractual right creates a continuing waiver is determined by an objective standard of whether a reasonable observer would conclude that the obligee no longer intended to insist on strict compliance. See 2 Restatement (Second), Contracts § 247, comment (a), p. 266 (1981); 13 R. Lord, supra, § 39:22, p. 590; 2A L. Lawrence, supra, § 2-209:98, p. 74.

Finally, waiver of a contractual requirement differs from a contractual modification in two important respects. First, "[w]hile a waiver may be effectuated by one party, a modification is the result of the bilateral action of both parties to the . . . transaction." (Internal quotation marks omitted.) *Dynamic Machine Works, Inc.* v. *Machine & Electrical Consultants, Inc.*, 444 Mass. 768, 771–72, 831 N.E.2d 875 (2005); 2A L. Lawrence, supra, § 2-209:50, p. 51. Second, and relatedly, whereas the modification of a contract may not be revoked without the consent of both parties, the obligee may, under certain circumstances, unilaterally retract its waiver of a contractual requirement. See *Dynamic Machine Works, Inc.* v. *Machine & Electrical Consultants, Inc.*, supra, 444 Mass. 772; *Nassau Trust Co.* v. *Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184, 436 N.E.2d 1265, 451 N.Y.S.2d 663, appeal denied, 57 N.Y.2d 674 (1982). Specifically, in contracts governed by the UCC, "[a] party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver." General Statutes § 42a-2-209 (5). This is consistent with our state's common law, which provides that an obligee may not "peremptorily put an end to further performance by the [obligor on the basis of the obligor's continued noncompliance with the waived contractual provisions] without first giving the [obligor] reasonable notice of its intention to demand a strict performance in the future." *Remington Arms Union Metallic Cartridge Co.* v. *Gaynor Mfg. Co.*, supra, 98 Conn. 731; see also *Bradford Novelty Co.* v. *Technomatic, Inc.*, supra, 142 Conn. 171; 2 Restatement (Second), supra, § 247, comment (b), p. 267.

With these legal principles in mind, we turn to the present case and, specifically, to the conclusion of the Appellate Court that the trial court's finding that the plaintiffs waived the minimum purchase requirement as to the sixth contract year was clearly erroneous. Because the issue is one of continuing waiver, before we address the sixth and subsequent contract years we first review the trial court's finding that the plaintiffs waived the minimum annual purchase requirement in previous contract years.

The trial court's findings in this respect are not as clear as they might be. In its memorandum of decision, the court found that the plaintiffs waived compliance with respect to the fourth and fifth contract years. In its December 22, 2011 articulation, the court corrected this finding and clarified that the plaintiffs waived the requirement as to the fifth and sixth contract years, as well as "any year thereafter." At that time, the court also articulated that "[the plaintiffs'] waiver [of the minimum purchase requirements] extended to the entire period, up to June 21, 2006, and would also have extended throughout the remainder of the contract . . . ." In a subsequent reply to the defendant's request for further articulation, however, the court stated that "the correction set forth in its December 22, 2011 articulation should not have been included therein," and reiterated its initial finding that "the conduct that gave rise to waiver occurred in the fourth and fifth years of the contract." *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 295.

There is no dispute that the trial court ultimately found that the plaintiffs intended to and did waive the minimum purchase requirement at least with respect to the fourth and fifth contract years. There is ample evidence in the record to support this finding, and neither party challenges it on appeal.[7] At a minimum, then, we must assume that the plaintiffs waived the relevant contractual requirements for two consecutive years leading up to the sixth contract year.

The parties disagree as to whether the trial court also found waiver in the third contract year. The plaintiffs contend that the trial court repeatedly declined the defendant's request that it find that they waived the minimum purchase requirement for that year. They further argue that any finding of waiver in year three contained in the court's December 22, 2011 articulation was without support in the record and was retracted by its subsequent clarification. The defendant, by contrast, relies on the trial court's statement in its December 22, 2011 articulation that the waiver covered the entire period up to June 21, 2006, and it contends that there is adequate evidence in the record to support a finding of waiver as to the third contract year. We agree with the defendant.

Although it is not entirely clear how much of the court's December 22, 2011 articulation it sought to revoke through its reply to the defendant's request for further articulation, the Appellate Court concluded, and we agree, that there is no indication that the trial court intended to alter or withdraw its finding that the plaintiffs' waiver applied to the entire period during which the parties had conducted business under the contract, and would have extended to the remaining years of the contract as well. See id., 306 and n.11; see also *Abington Ltd. Partnership* v. *Heublein*, 257 Conn. 570, 586 n.29, 778 A.2d 885 (2001) (this court construes ambiguous memorandum of decision to support judgment). We have no reason to gainsay this finding. The record contains evidence that: (1) the parties negotiated a mutually agreeable sales figure for the third contract year; (2) the plaintiffs wrote the defendant at the close of the third contract year to confirm that, notwithstanding the contractual shortfall, "the contract has been met [through] February 2003"; (3) two of the plaintiffs' executives opted to accept the defendant's performance and to forbear from issuing a shortfall notice for that year; and (4) the plaintiffs never invoiced the defendant for the year three shortfall.

We also are not persuaded by the plaintiffs' suggestion on appeal that they could not have waived the requirement for the third contract year because the shortfall to which they agreed, $221,584, was "de minimus . . . ." Neither the record nor the law supports this argument. At trial, the plaintiffs took the position that the defendant's performance in the third year was "not in compliance" with their contractual obligations. Moreover, even if the third year shortfall were de minimus, that fact would "[provide] only the motive for the waiver and [would] not vitiate the waiver itself." *Getty Terminals Corp.* v. *Coastal Oil New England, Inc.*, 995 F.2d 372, 375 (2d Cir. 1993).

Accordingly, we conclude that it was not clearly erroneous for the trial court to find that the plaintiffs had waived the minimum annual purchase requirement for three consecutive years prior to the sixth contract year. We also note that the plaintiffs conceded at trial that, for all three years of the predecessor 1997 agreement, the defendant failed to satisfy its minimum purchase requirements and the plaintiffs opted to continue doing business with the defendant and to forbear from issuing any shortfall invoice. There was evidence in the record, then, to support a finding that the plaintiffs waived the defendant's minimum annual purchase requirement in six of the eight years leading up to the sixth year of the 2000 agreement.

We now turn to the central question presented by this appeal, namely, whether, in light of the parties' course of performance under the 2000 agreement and their course of dealing under the previous 1997

agreement, it was clearly erroneous for the trial court to find that the plaintiffs' conduct gave rise to a continuing waiver that extended into the sixth year of the 2000 agreement. We begin by emphasizing that the plaintiffs bear a heavy burden in seeking to establish that the trial court's finding of continuing waiver was clearly erroneous. We also emphasize that the relevant question is not whether the plaintiffs subjectively intended to waive their rights in the sixth contract year, but, rather, whether a reasonable person in the position of the *defendant* would have interpreted the plaintiffs' course of conduct, in that year or previous years, to mean that the plaintiffs would not require strict compliance in the sixth year. See 2A L. Lawrence, supra, § 2-209:98, p. 74. Accordingly, the plaintiffs' argument that there is no evidence that they actually intended to waive the contractual requirements past the fifth year is unavailing.

In reviewing the trial court's findings, the Appellate Court recognized that the trial court had found that the parties' course of performance gave rise to a "permanent waiver" of the plaintiffs' right to enforce the minimum purchase requirement. *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 306. The Appellate Court did not appear to find fault with that finding.[8] Nevertheless, the Appellate Court proceeded to consider whether there was sufficient evidence to find that the plaintiffs waived their contractual rights *in the sixth contract year*. Id., 306–307. In that regard the Appellate Court went astray. Once a continuing waiver is established, the obligee need not repeatedly indicate anew its intent to waive its rights. Rather, the waiver persists, and the onus falls on the obligee to demonstrate that it *retracted* its waiver as to the executory portion of the contract. Accordingly, the Appellate Court should have inquired not into whether there was fresh evidence of waiver in the sixth contract year but, rather, whether there was evidence sufficient to support the trial court's finding of continuing waiver and, if so, whether the plaintiffs executed an effective retraction of that waiver prior to the sixth year.

As we have discussed, there was evidence sufficient to support a finding of waiver in six of the previous eight years of the parties' business relationship and, indeed, the plaintiffs have essentially conceded that they waived their rights as to five of those six years. Although the parties have not brought to our attention any Connecticut cases on point, and our own independent review has revealed none, courts in other jurisdictions regularly have found—or upheld findings of—continuing waiver of contractual rights where an obligee has acquiesced in between two and six instances of noncompliant performance. See, e.g., *Getty Terminals Corp.* v. *Coastal Oil New England, Inc.*, supra, 995 F.2d 375 (failure to bill for taxes and licensing fees for four years gave rise to continuing waiver requiring retrac-

tion); *Apex Pool Equipment Corp.* v. *Lee*, supra, 419 F.2d 559–64 (retraction of waiver was required where seller allowed buyer to purchase less than contractual minimum in first year of contract and for first several months of second year); *Ada Liss Group (2003) Ltd.* v. *Sara Lee Corp.*, Docket No. 1:06CV610 (NCT), 2014 WL 4370660, *8 (M.D.N.C. August 28, 2014) (seller's acquiescence in distributor's failure to provide annual and quarterly reports for several years resulted in waiver requiring retraction); *Gillani Consulting, Inc.* v. *Daewoo Heavy Industries America Corp.*, Docket No. C05-0823-JCC, 2006 WL 3545467, *11 (W.D. Wn. December 7, 2006) (waiver of transfer fees in 1997 and 2000 estopped software licensor from collecting fees for 2001 transfer), aff'd, 300 Fed. Appx. 466 (9th Cir. 2008); *Burger King Corp.* v. *Family Dining, Inc.*, 426 F. Supp. 485, 493 (E.D. Pa.) (where franchisor allowed franchisee to retain franchise after failing to meet contractual deadlines in contract years four and five, franchisor could not enforce deadlines strictly in years nine and ten without prior notice), aff'd, 566 F.2d 1168 (3d Cir. 1977); *In re Humboldt Fir, Inc.*, 426 F. Supp. 292, 297–98 (N.D. Cal. 1977) (granting of two one year extensions resulted in waiver requiring retraction before contractual deadline could be reinstated), aff'd sub nom. *United States* v. *Humboldt Fir, Inc.*, 625 F.2d 330 (9th Cir. 1980); *Duncan* v. *Malcomb*, 234 Ark. 146, 148–49, 351 S.W.2d 419 (1961) (lessor's acceptance of two of lessee's late annual rental payments held sufficient to establish continuing course of conduct); *Bio-Tech Pharmacal, Inc.* v. *International Business Connections, LLC*, 86 Ark. App. 220, 228–29, 184 S.W.3d 447 (2004) (affirming finding of waiver where buyer received and paid for several noncompliant orders without protest or complaint); *John B. Robeson Associates, Inc.* v. *Gardens of Faith, Inc.*, 226 Md. 215, 222–23, 172 A.2d 529 (1961) (by accepting sales below minimum requirement for two consecutive quarters, cemetery owner relinquished its right to terminate contract because of such defaults); *Farmers Elevator Co. of Reserve* v. *Anderson*, 170 Mont. 175, 180, 552 P.2d 63 (1976) (acceptance of multiple noncompliant deliveries over two month period established continuing course of conduct); *Southwest Industrial Import & Export, Inc.* v. *Borneo Sumatra Trading Co.*, 666 S.W.2d 625, 629 (Tex. App. 1984) (buyer waived contractual rights by accepting three deliveries of wire at price above contracted rate); see also annot., 31 A.L.R.2d 377, § 16 (1953) (acceptance of several late instalment payments, consistent with settled course of dealing, precludes summary termination for subsequent defaults without prior notice).

The parties' undisputed course of performance and course of dealing, then, adequately support the trial court's finding of continuing waiver. In light of the fact that the plaintiffs previously had accommodated the

defendant's deficient performance each time the defendant was unable to satisfy its contractual requirements, a course of conduct that spanned six of the eight years during which the parties did business together, it was not unreasonable for the trial court to credit testimony by the defendant's employees that the plaintiffs had led the defendant to believe that it could continue to purchase based on the realities of the marketplace.

Trial testimony from executives of both parties supports the trial court's finding in this regard. The defendant's vice president of logistics, Bonita J. Thomerson, testified that the plaintiffs' executive vice president, Michael S. Gostomski, told her late in the fourth contract year that "he thought that $5 million would be something that we could even look at continuing to do forward, that that was a reasonable volume to consider." By the sixth year, she indicated, the defendant was "operating under the premise that we had agreements on what our purchases would be, and they had agreed with them . . . ." The trial court expressly credited Thomerson's testimony. Indeed, Gostomski himself acknowledged that, after the second contract year, "I negotiated—I'll use the word 'discussed,' and went through various things with [employees of the defendant], but we would always go back and forth and come to a number that we would both agree upon."

In addition, it is noteworthy that the trial court also found that the parties, through their course of performance, attempted to modify the 2000 agreement so as to replace the minimum purchase requirement with a purchase requirement to be negotiated annually based on prevailing market conditions and the defendant's reasonably foreseeable business needs. The Appellate Court properly rejected this finding, concluding, as a matter of law, that any modification of the 2000 agreement by the parties' course of performance was barred by the contractual provision requiring that modifications be in writing. *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 300–301. Nevertheless, the trial court's finding that both parties intended permanently to modify their agreement is not without relevance. If, as the trial court found, the plaintiffs intended to permanently eliminate the minimum annual purchase requirement, then, it follows, they necessarily intended to *waive* that requirement on a continuing basis, and not simply for individual contract years. See *Wisconsin Knife Works* v. *National Metal Crafters*, 781 F.2d 1280, 1293–94 (7th Cir. 1986) (Easterbrook, J., dissenting); see also 2A L. Lawrence, supra, §§ 2-209:51 and 2-209:124, pp. 52, 83–84 (waiver can be established by lower demonstration of assent than required to prove modification).[9]

We also agree with the defendant that the Appellate Court improperly substituted its own judgment for that of the trial court when it concluded that the plaintiffs

could not have waived their contractual rights as to the sixth year. The Appellate Court, in reaching that conclusion, alluded to "evidence . . . that the defendant was not operating under the impression that the plaintiffs had relinquished their contractual rights." *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 307. We assume that the Appellate Court's reference is to: (1) internal e-mails sent by officers of the defendant during the sixth year reminding their sales and marketing personnel of the $7.1 million minimum sales requirement and urging those personnel to promote Nice products so as to meet the contractual requirement; (2) testimony by the plaintiffs, as well as an e-mail from an officer of the defendant, both indicating that, late in the sixth contract year, the parties discussed the possibility of converting the agreement to a requirements contract; and (3) evidence that the plaintiffs continued to remind the defendant of its contractual obligations during the sixth year. The plaintiffs contend that the defendant's employees would not have prodded their sales team to meet the minimum sales requirement, nor would they have sought to modify or eliminate that requirement, if they believed that the plaintiffs already had permanently waived it, and, in any event, they could not reasonably have reached that conclusion in light of the plaintiffs' frequent suggestions to the contrary.

None of the evidence upon which the Appellate Court relied, however, is incompatible with a finding of waiver. First, with respect to the defendant's internal e-mails to its sales staff, the defendant contends that, even though it believed heading into the sixth contract year that the plaintiffs would continue to accept purchases below the contractual minimum, its executives sought in good faith to maximize those purchases, in part by continuing to encourage its sales staff to try to meet the original contract targets. There was testimony at trial in support of this interpretation of the e-mails, and the trial court was free to credit that testimony.

Second, with respect to the parties' conversations regarding a potential transition to a requirements contract, we fail to understand how such conversations are incompatible with a finding that the plaintiffs had waived the minimum purchase requirement on a continuing basis. The defendant's view of the parties' relationship, which the trial court credited, is that, rather than insisting that the defendant purchase the contractual minimum, the plaintiffs opened negotiations each year by pressing for that minimum sales figure but ultimately "back[ed] off" to a sales level that the defendant thought the market reasonably could bear. Nevertheless, the plaintiffs continued to press the defendant throughout each year to purchase as many Nice products as possible and, at the very least, to meet its negotiated purchase commitment. Under a traditional requirements contract, by contrast, there would be no need for a conten-

tious annual negotiation process, nor would the defendant have been under constant pressure to attain a certain sales target. Rather, the defendant simply would have committed to obtaining any industrial bearings similar in design to Nice bearings that it required from the plaintiffs, rather than from other vendors. See Black's Law Dictionary (9th Ed. 2009) (defining "requirements contract" as one in which "a buyer promises to buy and a seller to supply all the goods or services that a buyer needs during a specified period" and noting that such contract "assures the buyer of a source for the period of the contract"). Accordingly, we perceive no contradiction in the defendant concluding that the minimum purchase requirement established by the 2000 agreement had been waived in favor of an annual negotiation process, and that the relationship between the parties might be made more harmonious—and the possibility of litigation reduced—if they were to enter into a formal requirements contract.

Third, with respect to the Appellate Court's conclusion that the plaintiffs could not have waived their rights because they "repeatedly attempted to secure the defendant's compliance with the minimum purchase requirement during the sixth year"; *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, supra, 146 Conn. App. 311; this was an incorrect statement of the law. In concluding that the plaintiffs did not waive the minimum purchase requirement as to the contract year ending February 28, 2006, the Appellate Court emphasized that the plaintiffs: (1) sent the defendant an invoice for the unpaid shortfall from the fifth contract year; id., 308–309; (2) constantly communicated with the defendant regarding the $7.1 million minimum purchase requirement for the sixth contract year; id., 309; and (3) expressed "that they were very concerned"; id., 311; about the " 'critical' " issue of the contractual shortfall. Id., 310–11.

However, the fact that an obligee repeatedly reminds an obligor of its contractual duties,[10] or complains of the obligor's noncompliance,[11] does not preclude a finding of waiver, when the obligee nevertheless continues to acquiesce in the obligor's noncompliance and to perform under the contract. The rule applies with particular force in the present case, where there was evidence that the plaintiffs gave the defendant intentionally mixed signals with regard to its minimum purchase requirement, and where the trial court found that the plaintiffs always had intended to terminate the contract prematurely and merely used the shortfall invoices as a pretext to do so when they decided that the time was right.

We next consider the plaintiffs' argument, which the Appellate Court embraced, that the law should hesitate to find a continuing waiver in a situation such as this where one party to a contract makes a good faith effort to accommodate its partner's initially unsuccessful

attempts to comply with its contractual obligations, rather than "suing at the first sign of breach." To hold otherwise, the plaintiffs contend, would promote unnecessary litigation at the expense of cooperation, and would deprive buyers such as the present defendant of the benefits of lenience during difficult market conditions. We are not persuaded.

We begin by noting that the narrative according to which the plaintiffs characterize their business relationship with the defendant—one in which they patiently tried to help the defendant satisfy its contractual obligations until they finally, reluctantly concluded that the recalcitrant defendant never would hold up its side of the bargain—was rejected by the trial court. The trial court found, instead, that *both* parties recognized throughout their relationship that, in light of market realities, it was in their mutual best interest to align their sales goals with the defendant's reasonably foreseeable business needs, and not to build up excess inventory that the defendant would be unable to sell and that the plaintiffs ultimately would have to repurchase under the terms of the 2000 agreement.[12] There was substantial evidence that this understanding changed only after the plaintiffs determined that it would be more profitable for them to cultivate their own direct sales force, cut out the middleman, and terminate the agreement.

Even if the equities favored the plaintiffs, however, the outcome would be no different. We agree with the plaintiffs that, in situations where one party to an agreement finds itself temporarily unable to satisfy its contractual obligations, but both parties desire to maintain the contract, there must be a mechanism by which the obligee can accommodate the obligor's nonperformance—perhaps even repeatedly—without permanently waiving its contractual rights. The plaintiffs' solution is, apparently, to require that the defendant prove by clear and convincing evidence that the plaintiffs intended to continue waiving the minimum purchase requirement past the fifth contract year.[13] Under this standard, even when an obligee's repeated waiver of a contractual duty creates in the obligor a reasonable belief that the obligee no longer intends to insist on compliance therewith, the obligor could not rely on that belief in the future, but would have to continually ascertain whether it remained true.

There are two problems with such a rule. First, although the plaintiffs may be correct that, under the UCC, clear and convincing evidence is required to establish a binding oral *modification* of a written contract; see 2A L. Lawrence, supra, § 2-209:9, p. 36; it would not be appropriate to impose that heightened standard of proof for a waiver. As we have explained, a waiver is a unilateral decision by an obligee not to insist on strict compliance with a contractual condition, and its existence and scope are, therefore, defined by the apparent

intent of the obligee. When it is not completely clear whether an obligee who repeatedly has waived its contractual rights intends to continue waiving those rights, it would be unreasonable to place the onus of properly interpreting the obligee's ambiguous behavior on the *obligor*. In the present case, for example, the plaintiffs repeatedly reminded the defendant of its contractual obligations and expressed concern over its deficient performance, but nevertheless continued to do business with the defendant and to acknowledge that its deficient performance had satisfied the contractual requirements. Under such circumstances, if the law were to require that the obligor be absolutely convinced before it could rely on the obligee's continued forbearance, then the benefits of accommodation touted by the plaintiffs would largely disappear.

Second, and relatedly, the rule urged by the plaintiffs would permit an unscrupulous obligee to ride the fence, tolerating noncompliance so long as that suits the obligee's interests but leaving it free to exercise its contractual remedies, without advance notice, whenever it sees fit. In fact, there is evidence in the record, and the trial court appears to have found, that that is precisely what the plaintiffs did in the present case. In July, 2005, for example, Hartnett, the plaintiffs' president and chief executive officer, instructed his director of business development to "[p]lay nice" by continuing to conduct business under the contract for the remainder of the sixth year, and to sell at a rate that did not result in the buildup of excess inventory, while at the same time putting the defendant on notice of its delinquency and reserving the plaintiffs' claim. These intentionally mixed messages left the plaintiffs' own employees confused as to the plaintiffs' policy with respect to enforcement of its contractual rights. One expressed that "we are getting conflicting signals from the top," while another requested "clearer direction on the tone" to be taken in communications with the defendant. If the plaintiffs' own officers, who were privy to its secret plans to take their distribution business direct, were unsure whether the plaintiffs intended to waive the minimum purchase requirement for the sixth year, it is unreasonable to expect the *defendant*, who had no knowledge of those plans, to discern when exactly the plaintiffs intended to change course and begin strictly enforcing their rights.

How, then, is an obligee to communicate, and its obligor to understand, that the obligee's previous willingness to waive a contractual requirement should not be construed as a continuing waiver? For agreements governed by the UCC, General Statutes § 42a-1-308 (a) provides clear guidance: "A party that, with *explicit reservation of rights*, performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as

'without prejudice', 'under protest' or the like are sufficient." (Emphasis added.) "The making of a valid reservation of rights preserves whatever rights the person then possesses and prevents the loss of those rights by application of the concepts of waiver . . . . [Specifically, the] right to cancel is not lost by the acceptance of performance when the aggrieved party has made a reservation of rights." 1A L. Lawrence, Anderson on the Uniform Commercial Code (3d 2004) § 1-308:14R, pp. 1174–75. A reservation of rights pursuant to § 1-308R of the UCC must be " 'so clearly stated or distinctively set forth that there is no doubt as to its meaning.' " Id., § 1-308:10R, p. 1173. "In the absence of [such] an express reservation, a party may be found to have waived his or her right to object . . . if that party performs or accepts the performance of the other contracting party." Id., § 1-308:3R, pp. 1170–71; see also id., § 1-308:17R, p. 1175 (failure to reserve rights may bar assertion of waived right at later date). Moreover, "[w]hen there is a series of performances by the [obligor], each performance of which involves a breach, the [obligee] making the reservation of rights should repeat the reservation for each performance rather than run the risk of being deemed to have waived his or her right by subsequently accepting a defective performance or performing without objection." Id., § 1-308:12R, p. 1174. The drafters of the UCC, then, made a reasonable determination that the obligee, whose choice it is to enforce or waive its contractual rights, should bear the risk of any ambiguity arising from its failure to clearly announce whether its decision repeatedly to waive those rights is to be construed as a continuing waiver.

In the present case, if the plaintiffs, when waiving the minimum purchase requirement as to the third through fifth contract years, wished to reserve their rights as to those or subsequent contract years, they had only to inform the defendant thereof. See, e.g., *Olean* v. *Treglia*, 190 Conn. 756, 772–73, 463 A.2d 242 (1983) (plaintiff declined to exercise option to accelerate indebtedness at time of sale but expressly reserved right as to future disposition of property); see also *County Fire Door Corp.* v. *C. F. Wooding Co.*, 202 Conn. 277, 289, 520 A.2d 1028 (1987) (noting that "article 2 [of the UCC; General Statutes § 42a-2-101 et seq.] urges the contracting parties to engage in a continuing dialogue about what will constitute acceptable performance of their sales contract" and provides "a statutory methodology for the effective communication of objections"). This they failed to do. Despite Hartnett's internal instruction to "reserve our claim," there is no evidence that the plaintiffs' employees ever communicated to the defendant a clear and unambiguous reservation of rights pursuant to § 42a-1-308. Accordingly, we conclude that the trial court's finding that the plaintiffs' previous waiver of the minimum purchase requirement extended into the sixth year and the executory portion of the 2000

agreement was not clearly erroneous.

The judgment of the Appellate Court is reversed with respect to the plaintiffs' breach of contract claims, and the case is remanded to that court with direction to render judgment affirming the judgment of the trial court in favor of the defendant on the plaintiffs' breach of contract claims and to remand the case to the trial court for further proceedings on the defendant's counterclaim.

In this opinion the other justices concurred.

[1] Although the parties briefed the issue of retraction before the trial court, that court did not address the issue in its memorandum of decision. Moreover, the Appellate Court, which concluded that there was no continuing waiver, had no cause to and did not directly address the question whether the plaintiffs executed a legally effective retraction of their waiver. On certification to this court, the plaintiffs—the only party that could benefit from a finding of retraction—concede that the issue of retraction is not properly before the court. Accordingly, we decline to address the issue.

[2] The Appellate Court also held that the trial court improperly determined that the defendant was not entitled to damages on its counterclaim. *RBC Nice Bearings*, *Inc.* v. *SKF USA*, *Inc.*, supra, 146 Conn. App. 311, 314. That issue is not before us in this certified appeal.

[3] The ninth and final year of the agreement was an exception, as it was to have ended December 31, 2008, rather than February 28, 2009. For the purpose of clarity in this opinion, we refer to the contract years not by the calendar year span (e.g., 2000–2001) but, instead, by the annual term of the contract. For example, the first contract year ran from March 1, 2000 through February 28, 2001, and the second contract year ran from March 1, 2001 through February 28, 2002.

[4] The plaintiffs also alleged breach of the covenant of good faith and fair dealing, unjust enrichment, trade secret violations, violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., violation of the Connecticut Unfair Sales Practices Act, General Statutes § 42-115e et seq., tortious interference with business relations, and usurpation of corporate opportunity.

[5] The defendant does not challenge those conclusions on appeal.

[6] The UCC defines a " 'course of performance' " as "a sequence of conduct between the parties to a particular transaction that exists if: (1) [t]he agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) [t]he other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." General Statutes § 42a-1-303 (a). The UCC distinguishes between a course of performance, which relates to the parties' conduct under the contract at issue, and a course of dealing, which relates to the conduct of the parties during transactions that occurred prior to the agreement. See General Statutes § 42a-1-303 (b); Conn. Gen. Stat. Ann. (West 2009) § 42a-1-303, comment (2), p. 63.

[7] To the extent that the Appellate Court determined that the plaintiffs could not have waived their rights during this period because they continually "insist[ed] that the defendant should be purchasing at the minimum purchase requirement level"; *RBC Nice Bearings*, *Inc.* v. *SKF USA*, *Inc.*, supra, 146 Conn. App. 306; that determination was incorrect. Although the plaintiffs at times *urged* the defendant to purchase the contractual minimum, by accepting or acquiescing in the defendant's noncompliant performance and continuing to perform under the agreement, the plaintiffs failed to *insist* on compliance in the legally relevant sense. See *MSO*, *LLC* v. *DeSimone*, 313 Conn. 54, 64, 94 A.3d 1189 (2014).

[8] We address hereinafter the Appellate Court's concern that an obligee's attempt to encourage a breaching party to adhere to its contractual obligations ought not be construed as a waiver. See *RBC Nice Bearings*, *Inc.* v. *SKF USA*, *Inc.*, supra, 146 Conn. App. 307.

[9] The Appellate Court also recognized that, under the UCC, "[a]lthough course of performance evidence that parties to a contract attempted to modify their contract may fail for lack of a signed writing in the face of a written modification clause, such evidence can operate as a waiver." (Internal quotation marks omitted.) *RBC Nice Bearings*, *Inc.* v. *SKF USA*, *Inc.*,

supra, 146 Conn. App. 305; see General Statutes § 42a-2-209 (4) ("[a]lthough an attempt at modification or rescission does not satisfy the requirements of [a signed writing] it *can* operate as a waiver" [emphasis added]). Because the trial court made an independent finding that the plaintiffs waived the defendant's compliance with the minimum annual purchase requirement, the Appellate Court did not have to resolve a question of first impression in Connecticut, over which legal scholars and our sister courts have divided, namely, whether an attempted oral modification barred by a no oral modifications clause *automatically* functions as a waiver, or does so only under certain circumstances. Compare *Wisconsin Knife Works* v. *National Metal Crafters*, supra, 781 F.2d 1287 (Posner, J.) (concluding that "an attempted modification is effective as a waiver only if there is reliance"), with id., 1290–94 (Easterbrook, J., dissenting) (concluding that detrimental reliance is not required for failed modification to function as waiver); see also *Dynamic Machine Works*, *Inc.* v. *Machine & Electrical Consultants*, *Inc.*, supra, 352 F. Supp. 2d 88 ("Section 2-209 of the UCC has been the cause of much confusion and unpredictability amongst courts and has led to a wealth of academic analysis. Specifically, judges and scholars alike have had difficulty in reconciling the five subsections of [§] 2-209 to avoid superfluous and inconsistent interpretations."). For the same reasons, we need not resolve that question here.

[10] See, e.g., *Lopez* v. *Bell*, 207 Cal. App. 2d 394, 399, 24 Cal. Rptr. 626 (1962) ("[T]he mere request for [performance] does not meet the requirement [of] . . . the giving of written notice [after acceptance of performance] that strict performance of the contract's covenants will be necessary in the future. To be reasonably definite, the notice should recite in substance that unless [performance is accomplished], far enough in the future to give the [obligor] reasonable time and opportunity to comply with his [contractual obligations], the contract will be terminated and forfeiture will take place." [Internal quotation marks omitted.]); *Battista* v. *Savings Bank of Baltimore*, 67 Md. App. 257, 271, 507 A.2d 203 (1986) (upholding finding of ongoing waiver when bank repeatedly sent debtor " 'ten-day letter' " warning of need for strict compliance, but failed to repossess car).

[11] See *Remington Arms Union Metallic Cartridge Co*. v. *Gaynor Mfg. Co*., supra, 98 Conn. 732 ("[i]t is of no consequence that the [obligee] protested against the shortage and delay in deliveries"); see also *BMC Industries*, *Inc*. v. *Barth Industries*, *Inc*., 160 F.3d 1322, 1335 (11th Cir. 1998) (finding waiver as matter of law when obligee's executives frequently expressed concern and disappointment with performance of obligor and implored obligor to exert every effort to ensure speedy completion of project, but never declared obligor in default or terminated contract), cert. denied, 526 U.S. 1132, 119 S. Ct. 1807, 143 L. Ed. 2d 1010 (1999); *Southwest Industrial Import & Export*, *Inc*. v. *Borneo Sumatra Trading Co*., supra, 666 S.W.2d 628–29 (finding waiver, as matter of law, where buyer informed seller that " 'I think this is unreal, unjust,' " but continued to accept nonconforming deliveries); 2A L. Lawrence, supra, § 2-209:99, p. 75 (waiver properly found where buyer asserted that manufacturer's near doubling of price charged was unreasonable but agreed to new price); but see 2 Restatement (Second), supra, § 247, reporter's note comment (a), p. 268 (raising but not resolving question whether obligor is justified in assuming that performance is waived when obligee accepts but consistently complains of nonperformance).

[12] We also see no evidence in the record to support the Appellate Court's apparent assumption that the plaintiffs continued their relationship with the defendant " 'only on the assurance of better future performance . . . .' " *RBC Nice Bearings*, *Inc*. v. *SKF USA*, *Inc*., supra, 146 Conn. App. 307. On the contrary, the plaintiffs themselves have complained that the defendant took a " 'take it or leave it' " approach with respect to its contractual purchase obligations.

[13] We do not read the authorities cited by the plaintiffs to support this rule.